**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| **JENNIFER L.[1],** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 7:20-CV-442** |
| ) | |
| **KILOLO KIJAKAZI[2], Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Jennifer L. ("Jennifer") filed this action challenging the final decision of the

Commissioner of Social Security ("Commissioner") finding her not disabled and therefore

ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). 42

U.S.C. §§ 401–433. Jennifer alleges that the Administrative Law Judge ("ALJ") erred by failing

to properly: (1) determine that her cervical radiculopathy is a severe impairment; (2) determine

her physical residual functional capacity ("RFC") and perform a function-by function analysis;

and (3) assess her subjective allegations. I conclude that substantial evidence supports the

Commissioner's decision in all respects.  Accordingly, I **RECOMMEND GRANTING** the

Commissioner's Motion for Summary Judgment (Dkt. 17) and **DENYING** Jennifer's Motion for

Summary Judgment (Dkt. 14).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

the Commissioner's conclusion that Jennifer failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). "The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." Biestek, 139 S. Ct. 1148. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

## CLAIM HISTORY

Jennifer filed for DIB benefits in November 2016, claiming that her disability began on May 1, 2013, due to angina, fibromyalgia and panic attacks. R. 221.[4] The state agency denied Jennifer's claims at the initial and reconsideration levels of administrative review. R. 73–82, 84–93. ALJ Thomas Erwin held a hearing on May 22, 2019, to consider Jennifer's claim for DIB, which included testimony from vocational expert Asheley Wells. R. 47–72. Jennifer was represented by counsel at the hearing. On July 10, 2019, the ALJ entered his decision considering Jennifer's claims under the familiar five-step process[5] and denying her claim for benefits. R. 17–39.

The ALJ found that Jennifer suffered from the severe impairments of degenerative disc disease of the cervical spine, obesity, fibromyalgia, angina, osteoarthritis of the hips, lumbago, peripheral neuropathy and asthma. R. 19. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 22–24. The ALJ concluded that Jennifer retained the RFC to perform sedentary work, except that she can occasionally climb, balance, stoop, kneel, crouch and crawl; and can occasionally be exposed to extreme cold, vibration, excessive noise or exposure to more than moderate noise,

---

[4] Jennifer's date last insured was June 30, 2016; thus, she must show that her disability began on or before this date and existed for twelve continuous months to receive disability insurance benefits. R. 36; U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

and pulmonary irritants. R. 24. The ALJ found that Jennifer can never be exposed to hazards or unprotected heights. Id.

The ALJ determined that Jennifer was unable to perform her past relevant work as a retail manager, home attendant, and cashier. R. 37. However, the ALJ determined that Jennifer could perform other work that exists in the national economy such as addressing clerk, weight tester, and assembler. R. 38–39. Thus, the ALJ concluded that Jennifer was not disabled. Id. Jennifer appealed and the Appeals Council denied her request for review on June 19, 2020. R. 1–6.

## ANALYSIS

### Cervical Radiculopathy

Jennifer alleges that the ALJ failed to evaluate her cervical radiculopathy at step 2 of the opinion, and thus, did not impose restrictions on her ability to use her upper extremities. Pl. Br. Summ. J. p. 25–30. Jennifer also alleges that the ALJ failed to assess whether her impairments limited her ability to reach, handle, finger, feel, lie down during the day, or result in absences from work. [6] Id. at 32.

Jennifer was diagnosed with obesity, fibromyalgia, angina, osteoarthritis of the hips, lumbago, peripheral neuropathy and asthma during the relevant period. Jennifer stopped working as a home health aide in May 2013, after sustaining a neck injury when lifting a patient. R. 25, 471. Jennifer also complained of chest pain and pain in her left arm in May 2013. R. 285, 297. Jennifer's EKG was normal, her chest x-rays were normal, and a 24-hour Holter monitor was normal. R. 286, 308, 310. Thereafter, Jennifer's physicians determined that her chest and left

---

[6] Jennifer's appeal focuses solely on her physical impairments; thus, I will not address her mental impairments in this opinion.

arm pain was likely musculoskeletal in nature, and her heart condition was stable and benign. R. 315–16, 653, 656.

In August 2013, an x-ray of Jennifer's cervical spine showed moderate disc space narrowing at C5-C6 and C6-C7 with small anterior osteophytes. R. 720–21. In January 2014, Jennifer visited her primary care physician, Mary-Ellen Mick, D.O., and reported neck pain, and that she will pop and crack her neck on occasion. She tried Flexeril but it did not help "much." R. 441. Jennifer also noted that she had some paresthesias from her neck through her left elbow. Id. Jennifer did not have weakness in her left arm and denied any numbness or tingling in her fingers of her left hand. Id.

Jennifer visited Dr. Mick in March 2014, and reported that she's been seeing a chiropractor three times a week for neck pain. R. 433. Dr. Mick indicated that Jennifer's neck pain and left arm symptoms would be assessed with an MRI. R. 434.

An MRI taken on March 18, 2014, showed loss of disc height at C5-C6 with disc/osteophyte complex and uncovertebral spurring posterolaterally on the left with mild foraminal stenosis, and significant central/right paracentral disc herniation with encroachment on and posterior displacement of the spinal cord. R. 339.

Jennifer saw James Leipzig, M.D., for evaluation of her cervical spine on May 8, 2014. R. 2346. Dr. Leipzig noted that Jennifer was overweight, in no acute distress, her cervical range of motion is unrestricted, she had no obvious neurologic deficit, she denied any sensory deficit and her grip was normal. Id. Dr. Leipzig diagnosed degenerative cervical spine at C5-C6 and C6-C7 with neck pain; neural foraminal stenosis left C5-C6 that is symptomatic; and chronic appearing right C6-C7 disk protrusion. Id. Dr. Leipzig noted that he discussed options for management, such as epidural injection, physical therapy and possibly surgery. Jennifer was "not

interested in surgery whatsoever," and is "fearful of epidurals." Dr. Leipzig referred Jennifer for physical therapy. Id.

Jennifer eventually underwent a cervical epidural steroid injection at C6-C7 in December 2014. R. 347. Jennifer reported that the injection helped for a week, but she continued to have ongoing pain in her neck, anterior chest and left arm. R. 323.

Regarding fibromyalgia, Jennifer treated with rheumatologist Sorina Dancea, M.D. in December 2014 and reported widespread pain since 2012. R. 327. Jennifer reported pain mainly in her neck, but also back and chest, and left arm numbness and weakness. Jennifer took amitriptyline for her fibromyalgia, but it did not help with her pain. Dr. Dancea diagnosed myalgia and myositis, and recommended regular exercise and good sleep, including aqua therapy, yoga, tai chi, walking, and stretching. R. 330. Dr. Dancea also encouraged Jennifer to start taking Gabapentin. Jennifer followed up with Dr. Dancea in February 2015, and reported taking Gabapentin, sleeping "pretty good," and her overall pain is somewhat better. R. 323. She is trying to exercise daily with wii-fit aerobics, and still has pain in her hips when getting up from the floor but no difficulty walking. Id. Dr. Dancea noted that Jennifer was doing somewhat better on her current medication and recommended increasing Neurontin and continuing a regular exercise routine. R. 326.

Jennifer underwent epidural steroid injections in her neck in December 2014 (R. 347), May 2015 (R. 351), and October 2015 (R. 352). Jennifer followed up with Raschid Ghoorahoo, FNP, on October 19, 2015, for acute pain in her neck. R. 397. Jennifer had an epidural steroid injection earlier that day, and then developed sharp pain in her neck radiating down her right arm. Jennifer was instructed to take Tylenol for pain and rest. R. 399.

Jennifer visited a chiropractor from February 2014 through February 2016 for cervicalgia caused by degenerative disc disease of her cervical spine. R. 465–521.

An MRI taken of Jennifer's cervical spine on April 15, 2016 was not significantly changed from the March 2014 study and showed mild-to-moderate spinal canal stenosis and mild multilevel degenerative changes. R. 528–29.  An MRI taken in July 2017 showed moderate spinal canal stenosis at C6-C7 that slightly progressed, severe left foraminal stenosis on the left at C5-6, moderate foraminal stenosis on the left at C6-7. R. 1554–1557.

Jennifer continued following up regarding neck pain that radiates to both shoulders and down her left arm, along with numbness and tingling in her left hand. R. 586, 884, 887, 1166. Upon exam, Jennifer consistently had decreased range of motion of her neck and tenderness over the upper back and neck. Id.

In July 2016, Jennifer began a series of cervical transforaminal epidural steroid injections on the left at C6-C7.  See R. 763, 777, 779, 781, 858, 860.

Jennifer visited Murray Joiner, Jr., M.D. on October 20, 2016, and reported that nerve blocks improved her pain 70 percent. R. 783. She described her pain as a 10/10 without the injections, and 3/10 with injections. Dr. Joiner recommended physical therapy and trigger point injections in her neck. R. 786.

Jennifer followed up with Dr. Joiner in January 2017 and reported that she had greatly improved since beginning physical therapy and her headaches significantly decreased. R. 759. Jennifer said the nerve blocks helped approximately 90 percent, but seem to be wearing off. Id.

On October 10, 2017, Jennifer underwent an anterior cervical decompression at C5-6 and anterior cervical interbody fusion at C5-6. R. 892.  A few weeks later, Jennifer reported doing

very well; however, by January 2018, Jennifer reported that her left arm pain and numbness returned. R. 866.

On March 20, 2017, state agency physician Daniel Camden, M.D., reviewed Jennifer's records and determined that there was insufficient evidence to determine Jennifer's functioning before her date last insured of June 30, 2016. R. 79.  On January 24, 2018, state agency physician David Bristow, M.D., reviewed Jennifer's records on reconsideration and agreed that there was insufficient evidence to evaluate the severity of Jennifer's impairments prior to June 30, 2016. R. 90.

Jennifer asserts that the ALJ erred by finding that her cervical degenerative disc disease was a severe impairment, but failing to address her cervical radiculopathy.[7] Pl. Br. Summ. J. p. 26. Jennifer asserts that the ALJ should have found her cervical radiculopathy to be a severe impairment and that it required additional accommodations in the RFC.  Jennifer also argues that the ALJ erred by labeling her treatment "essentially routine and/or conservative in nature."  Pl. Br. Summ. J. p. 30. Jennifer also asserts that the ALJ failed to make specific finding regarding whether her impairments would limit her ability to reach, handle, finger, need to lie down during the day, or result in absences from work. Id. at 32.

The ALJ did not list Jennifer's cervical radiculopathy as a separate severe impairment, but considered it together with and/or as a symptom of Jennifer's cervical degenerative disc disease. Regardless of whether the ALJ should have separately listed Jennifer's cervical radiculopathy as a severe impairment, the ALJ considered the condition, together with the combined effect of all of Jennifer's impairments, when assessing her RFC.  Thus, any error

---

[7] Cervical radiculopathy occurs when a nerve in the neck is compressed or irritated where it branches away from the spinal cord, and may cause pain that radiates into the shoulder and/or arm, as well as muscle weakness and numbness. See https://orthoinfo.aaos.org/en/diseases--conditions/cervical-radiculopathy-pinched-nerve/

committed by the ALJ in not listing Jennifer's cervical radiculopathy as a severe impairment is harmless.

Under 20 C.F.R. § 404.1523, the ALJ must consider the combined effect of all claimant's impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. "Thus, the issue of whether a particular impairment is found severe is only critical if the ALJ finds no severe impairment and ends the analysis at step two; if any impairment is severe, the ALJ must consider all impairments when assessing residual functional capacity." Miller v. Astrue, No. 8:10-1142-HMH-JDA, 2011 WL 1576203, at *15 (D.S.C. Apr. 7, 2011). Consequently, any error by the ALJ at step two is harmless if the ALJ considers the effects of all of Jennifer's impairments in the subsequent steps. See Boone v. Saul, No. 7:18cv223, 2019 WL 3780273, at *7 (W.D. Va. Aug. 12, 2019) (citing Carrico v. Colvin, NO. 6:14cv32, 2016 WL 1065832, at *3 (W.D. Va. Mar. 16, 2016)(explaining that "any error by the ALJ at step two is harmless if the ALJ considers the effects of all of [the claimant's] impairments in the subsequent steps") (collecting cases)).

The ALJ's decision recognizes Jennifer's allegation of neck pain with radiculopathy from cervical degenerative disc disease. R. 25. Jennifer correctly asserts that she was diagnosed with cervical radiculopathy and consistently complained of pain radiating to her left arm, and that she had weakness in left arm and hands. The ALJ reviewed Jennifer's medical treatment history in detail, and noted Jennifer's complaints of pain radiating to both shoulders and down the left arm and hand, and numbness and tingling in the left hand. R. 31.  The ALJ noted that Jennifer was diagnosed with cervical radiculopathy and found to be a surgical candidate. R. 32.

The ALJ reviewed the opinions of the state agency physicians that there was insufficient evidence to evaluate Jennifer's claim prior to her date last insured. R. 34.  The ALJ gave these

opinions little weight, finding sufficient evidence to conclude that Jennifer was limited to a sedentary RFC. Id. In support of this conclusion, the ALJ stated, "[s]he also had neck pain with radiculopathy from cervical degenerative disc disease, had multiple cervical epidural steroid injections, and had an anterior cervical discectomy with fusion at C5-C6 in October of 2017." R. 34.

The ALJ gave some weight to the October 2013 opinion of Jennifer's treating physician, Stephan Kellam, M.D., that Jennifer should avoid lifting heavy items due to her back pain. R. 34. The ALJ noted that the opinion was written for an acute flare up of back pain and did not define the term "heavy." Id.

The ALJ reviewed Jennifer's symptoms, including her neck pain with radiculopathy from degenerative disc disease. R. 36. The ALJ noted Jennifer's treatment of pain medication, epidural steroid injections, chiropractic appointments, and surgical fusion. Id. The ALJ stated, "[a]lthough she had extensive treatment for her cervical degenerative disc disease from 2013 through 2016, she did not have surgery on her cervical spine until October of 2017." R. 36. The ALJ noted that Jennifer had tight musculature in the trapezius and neck area, and tenderness and reduced range of motion in her back and neck. Id.

Despite complaints of radiating pain and numbness to her left arm and hand in the record, Jennifer does not assert, nor do her medical records reflect, any weakness in her left arm or hand. Jennifer's examinations showed reduced range of motion and tenderness in her neck, and diminished sensation in her hand, but full strength in her extremities, normal reflexes and coordination. R. 399, 472, 588, 884, 889. Jennifer points to one treatment record on February 11, 2015, where Sorina Dancea, M.D. noted "some weakness in the left arm." R. 326. However, on April 4, 2016, Jennifer visited Laura Dorn, PA-C, and complained of neck pain that radiates

to both shoulders and down her left arm to hand, with numbness and tingling in her left hand, but *no weakness*. R. 887.  Further, during the administrative hearing, Jennifer testified regarding the symptoms of her impairments, and made no claims regarding difficulty using her arms or hands, or weakness in her arms and hands. The record does not support Jennifer's claim that her cervical radiculopathy warranted additional restrictions in the RFC, or that the ALJ should have found that her impairments limit her ability to reach, handle or finger.

Thus, the ALJ reviewed Jennifer's medical records, complaints and subjective statements in detail, and considered the symptoms of her cervical radiculopathy. The ALJ accounted for Jennifer's symptoms by limiting her to sedentary work.  Despite not labeling the cervical radiculopathy a separate "severe impairment," the ALJ considered the evidence relating to this condition, and accounted for the associated symptoms when developing the RFC.

### Function-by-Function Analysis

Jennifer asserts that the ALJ failed perform a function-by-function analysis, and failed to make specific findings regarding whether her impairments would limit her ability to reach, handle, finger, need to lie down during the day, or result in absences from work. Id. at 32.

A function-by-function analysis requires the ALJ to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting her ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8P, 1996 WL 374184 (S.S.A. July 2, 1996).[8] The ALJ is instructed to cite specific medical facts

_____

[8] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

and non-medical evidence supporting his conclusion, discuss the individual's ability to perform

sustained work activities in an ordinary work setting on a regular and continuing basis, describe

the maximum amount of each work-related activity the individual can perform, and explain how

any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR

96-8P, 1996 WL 374184, at *7.

    In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ

does not perform an explicit function-by-function analysis," agreeing instead with the Second

Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity

to perform relevant functions, despite contradictory evidence in the record, or where other

inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636

(citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand

was necessary, in part, because the ALJ failed to indicate the weight given to two residual

functional capacity assessments which contained relevant conflicting evidence regarding the

claimant's weightlifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at

*3 (N.D. W. Va. Apr. 29, 2015).

    Here, the ALJ performed the required function-by-function analysis. The ALJ recognized

that Jennifer had neck pain with radiculopathy from cervical degenerative disc disease, treated

with multiple cervical epidural steroid injections, attending chiropractic appointments, and

underwent an anterior cervical discectomy with fusion at C5-C6. R. 36.  The ALJ noted that

Jennifer reported improvement of her neck pain with medications, chiropractic sessions and

epidural steroid injections from 2013 to 2016. The ALJ recognized that Jennifer consistently

complained of tenderness and reduced range of motion in her back and neck. The ALJ noted that

Jennifer's neurological examinations were unremarkable with no sensory or motor deficits, and

her gait and station were normal with no balance issues. Id.  The ALJ also noted that Jennifer was not entirely compliant with her prescribed treatment; she complained of neck pain for many years before her alleged onset date, including years when she still worked; and her reported daily activities were not consistent with total disability. The ALJ found it significant that none of Jennifer's treating physicians placed permanent limitations on her activities or stated that she was unable to work from 2013 through 2016. R. 37.

As noted above, there is no evidence in the record to support Jennifer's claim that the ALJ should have limited her ability to reach, handle or finger.  Likewise, the evidence does not support Jennifer's claim that the ALJ erred by failing to find that she needed to lie down during the day or would be absent from work. Jennifer offers no specific evidence in support of this allegation of error. Indeed, Jennifer's need to lie down during the day and be absent from work are assertions she made during the administrative hearing that the ALJ found unsupported by the record.  The ALJ is not required to make specific findings related to Jennifer's subjective assertions that she must lie down during the day and is unable to maintain a static work posture. See Shinaberry, 2020 WL 908887, at *6 (ALJ did not err in refusing to fully credit claimant's subjective statements regarding her physical limitations where claimant pointed to no medical evidence in support of a limitation.).  The ALJ was only required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to his conclusion," which the ALJ did in his discussion of the medical and non-medical evidence, Jennifer's alleged symptoms, and the medical opinions of record.

Attacking whether substantial evidence exists requires more than Jennifer simply identifying her statements that are inconsistent with the ALJ's findings.  A claimant must show that the ALJ used an improper legal standard, did not consider a relevant portion of the record,

did not satisfy the duty of explanation, or the overwhelming weight of inconsistent evidence

overcomes the very low substantial evidence standard. The Fourth Circuit has been clear that an

ALJ's findings "as to any fact, if supported by substantial evidence, shall be conclusive." Hart v.

Colvin, No. 5:169cv32, 2016 WL 8943299, at *3 (N.D.W. Va. Sept. 14, 2016) (quoting Walls v.

Barnhart, 296 F. 3d 287, 290 (4th Cir. 2002)). The ALJ provided a detailed and comprehensive

summary and analysis of Jennifer's impairments, medical records, testimony and opinion

evidence.  The ALJ discussed Jennifer's symptoms, her resulting limitations, the medical

evidence, the medical opinions, Jennifer's testimony, and conflicting medical evidence. R. 24–

37.  Because I was not "left to guess" at how the ALJ reached his RFC determination, I find that

the ALJ's conclusion is supported by substantial evidence. Mascio, 780 F.3d at 637.

### Subjective Allegations

Jennifer also alleges that the ALJ failed to properly assess her subjective allegations. Pl.

Br. Summ. J. p. 33.  Jennifer asserts that the ALJ improperly discredited her statements about the

severity of her symptoms because the ALJ did not find them consistent with the objective

evidence, citing to Arakas v. Commissioner, 983 F.3d 83 (4th Cir. 2020). Jennifer is correct that

objective evidence is not required to find a claimant disabled. However, that does not require an

ALJ to accept without question a claimant's complaints of disabling pain from impairments that

do not always have objective markers.

Jennifer also asserts that the ALJ erred by relying upon her daily activities to discount her

subjective allegations without acknowledging the extent to which Jennifer performed those

activities, or considering how those activities reflected that she could persist at work for an 8-

hour day.

14

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. (emphasis added).

A reviewing court gives great weight to the ALJ's assessment of a claimant's statements and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). Further, a reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. See Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 68 (D. Md. May 4, 2016) (citing Edeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997)).

Here, the ALJ determined that Jennifer's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. R. 35. The ALJ noted that Jennifer cared for

her three children, listed exercise as "walking, running, and biking," admitted in January 2014

that she tried to walk one hour twice a day, took an airplane trip to her sister's wedding in

Florida in 2014, and a long car trip in June 2014. Id.  Additionally, Jennifer mentioned to her

rheumatologist in February 2015 that she exercised daily with aerobics, had no difficulty

walking, and attends church. The ALJ determined that these activities are not as limited as one

would expect given Jennifer's complaints of disabling symptoms. Id.  Notably, the ALJ did not

state that these activities indicated that Jennifer could perform work for 8-hours a day, but simply

that they were not entirely consistent with her complaints of disabling symptoms.

The ALJ also noted that Jennifer told her doctor she could not work until she figured out

what was going on with her heart in December 2013, but that her records reflected that her heart

condition was stable and benign from late 2013 through 2016. R. 35.

The ALJ acknowledged that "pain and symptoms are not always accompanied by

objective evidence and will not disregard the claimant's statements regarding symptoms solely

due to a lack of objective evidence.  However, objective medical evidence can bolster a

claimant's subjective complaints of pain and symptoms and is a 'useful indicator to help make

reasonable conclusions about the intensity and persistence of symptoms.'" R. 36 (quoting SSR

16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017)).  The ALJ found that Jennifer's treatment of

her allegedly disabling impairments was essentially routine and/or conservative in nature, and

was generally successful in controlling her symptoms. R. 36.  In support, the ALJ noted that

Jennifer stopped working in 2013 due to chest pain and neck pain after lifting a heavy patient as

a home health aide. However, her cardiac testing was benign, and her cardiologist believed the

chest pain was related to an artery in her heart that was compressed when a muscle spasm

occurred in November 2013.  Thereafter, Jennifer's heart was stable with only occasional and

benign premature beats. The ALJ recognized that Jennifer had neck pain with radiculopathy from cervical degenerative disc disease, underwent multiple cervical epidural steroid injections, chiropractic treatment, and eventually (after the relevant period in this case) surgery in October 2017. The ALJ acknowledged that Jennifer "had extensive treatment for her cervical degenerative disc disease from 2013 through 2016," and "reported improvement of her neck pain with medications, chiropractic sessions, and epidural steroid injections from 2013 through 2016." R. 36. The ALJ noted that Jennifer initially declined surgery from Dr. Leipzig and requested conservative treatment through 2016. Id.

Regarding her fibromyalgia, the ALJ noted that a rheumatologist diagnosed Jennifer with fibromyalgia due to multiple tender points in 2014, but the condition responded to medication such as Neurontin. The ALJ recognized that Jennifer had multiple tender points consistent with fibromyalgia, and had tenderness and a reduced range of motion in her back and neck. The ALJ also noted that Jennifer had osteoarthritis in her hips, lumbago, and peripheral neuropathy that was generally treated with pain medication. The ALJ noted that Jennifer's neurological examinations were unremarkable with no sensory or motor deficits seen, and normal gait and station. Id.

The ALJ also found that Jennifer was not entirely compliant with her prescribed treatment; she complained of neck pain for many years before her alleged onset date, including years when she still worked; and her reported daily activities were not consistent with total disability. The ALJ found it significant that none of Jennifer's treating physicians placed permanent limitations on her activities or stated that she was unable to work from 2013 through 2016. R. 37. Based upon all of these findings, that ALJ determined that Jennifer's functional capacity is not as limited as she alleged, and that she could perform a range of sedentary work.

17

Jennifer alleges that the ALJ erred by improperly discrediting her symptoms from fibromyalgia based upon her other normal objective findings such as lack of sensory or motor deficits, normal gait, and normal balance, citing to Arakas v. Commissioner, 983 F.3d 83 (4th Cir. 2020). Pl. Br. Summ. J. p. 35. In Arakas, the Fourth Circuit noted that fibromyalgia is a condition that does not necessarily create objective findings, and it was improper for the ALJ to rely on the absence of objective findings to discount the plaintiff's subjective statements regarding her pain and limitations.  Id., 983 F.3d at 97 ("Thus, while the ALJ may have considered other evidence, his opinion indicates that the lack of objective medical evidence was his chief, if not definitive, reason for discounting Arakas's complaints."). The Court emphasized that a claimant is entitled to rely exclusively on subjective evidence to prove that his symptoms are so continuous and/or so severe that they prevented him from working a full eight-hour day. Id. at 96.

Thus, it is improper for an ALJ to require that a claimant's subjective descriptions of his symptoms be supported by objective medical evidence. Id.  However, "while an ALJ may not discredit Plaintiff's subjective complaints of 'intensity, persistence, and limiting effects of symptoms *solely* because objective evidence does not substantiate,' she is not required to defer to those subjective complaints 'to the extent they are inconsistent with the available evidence.'" Willa F. v. Kijakazi, No. ADC-20-2659, 2021 WL 5167018, at *7 (D. Md. Nov. 5, 2021) (quoting Arakas, 983 F.3d at 95 (emphasis added); Lavinia R., No. CV SAG-20-1083, 2021 WL 2661509, at *4 (D. Md. June 29, 2021)).

Here, the ALJ recognized that Jennifer suffered from fibromyalgia, and noted her multiple tender points consistent with fibromyalgia. The ALJ also noted that Jennifer's fibromyalgia responded to medication such as Neurontin. R. 36, 326.  Indeed, on February 10,

2015, Dr. Dancea noted, "Fibromyalgia-…She seems to be doing somewhat better on the current dose of Neurontin…I advised her to increase the Neurontin by one tablet every week, as below. She is also aware that she should continue with a regular exercise routine." R. 326.

The ALJ cited to objective medical evidence in the record when discussing all of Jennifer's alleged disabling conditions and symptoms, not simply fibromyalgia. For example, the ALJ noted that Jennifer had tight musculature in her trapezius and neck area, multiple tender points consistent with fibromyalgia, and tenderness and a reduced range of motion in her back and neck. R. 36. The ALJ also recognized that Jennifer's neurological examinations were unremarkable with no sensory or motor deficits, and her gait and station were normal. Id. The ALJ also considered Jennifer's activities of daily living, her course of treatment for all of her medical conditions, her compliance with prescribed treatment, and the lack of limitations suggested by her treating physicians. The ALJ's analysis of Jennifer's subjective assertions is consistent with the regulations requiring the ALJ to consider numerous factors, including her medical treatment and daily activities. The ALJ did not, as Jennifer claims, "effectively require[d] objective evidence for [Jennifer's] fibromyalgia." Pl. Br. Summ. J. p. 35.

Jennifer also points to Brown v. Comm'r, 873 F.3d 251 (4th Cir. 2017), to support her argument that the ALJ failed to acknowledge the extent to which she performed her activities of daily living. However, unlike in Brown, here the ALJ did not use limited daily activities to determine that Jennifer could complete a full workday. [9] The ALJ cited to Jennifer's reported activities and determined that these activities are not as limited as one would expect given Jennifer's complaints of disabling symptoms. The ALJ also considered more than Jennifer's

---

[9] Also, unlike in Brown, the ALJ here did not fail to consider any doctor's opinions, or wrongly credit a psychiatric medical expert's testimony over the "consistent opinions of [five] treating and examining sources" who found disabling physical limitations. Brown, 873 F.3d at 266.

daily activities when assessing her subjective allegations.  Beyond these activities, the ALJ

concluded that Jennifer's allegations were inconsistent with her medical records, overall

treatment history, her prior work history, and the lack of restrictions recommended by her

treating physicians.

Substantial evidence supports the ALJ's determinations regarding Jennifer's allegations.

The ALJ reviewed Jennifer's testimony in detail, along with the evidence of record. The ALJ

found that Jennifer's statements concerning the limiting effects of her symptoms were not

entirely consistent with the medical evidence and other evidence in the record.  The ALJ outlined

her reasons for this determination in detail and her reasoning is examined above.  Thus, the

ALJ's analysis of Jennifer's subjective allegations is supported by substantial evidence. See

Ladda v. Berryhill, 749 Fed. Appx. 166 (4th Cir. Oct. 18, 2018) (upholding the ALJ's credibility

determination because the ALJ explained his reasoning and weighed the claimant's subjective

statements against other evidence.)

## **CONCLUSION**

I **RECOMMEND** entering an order **AFFIRMING** the final decision of the

Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's

motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United

States District Judge, and to provide copies of this Report and Recommendation to counsel of

record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any

objections to this Report and Recommendation within fourteen (14) days hereof.  Any

adjudication of fact or conclusion of law rendered herein by me that is not specifically objected

to within the period prescribed by law may become conclusive upon the parties.  Failure to file

specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well

as to the conclusion reached by me may be construed by any reviewing court as a waiver of such

objections, including the waiver of the right to appeal.

Entered: February 7, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge